No. _____, Orig.

In The District Court of the United States

for the District of Colorado

**FILED**
UNITED STATES DISTRICT COURT
DENVER, COLORADO

**JUL 29 2021**

JEFFREY P. COLWELL
CLERK

Jaime Naranjo-Herrera

*Pro Se Applicant,*

v.

Attorney General of the United States, Merrick Garland

Officer Fabre

Immigration Control and Enforcement

Warden Choate

Aurora ICE Processing Centre.

*Respondents.*

**Ex Parte Petition for Writ of Habeas Corpus**

JAIME NARANJO-HERRERA
*Detainee*
AURORA ICE PROCESSING CENTER.
3130 North Oakland Street,
Aurora, CO 80010
303 361-6612

# EX PARTE PETITION FOR A WRIT OF HABEAS CORPUS

This is an ex parte petition for a writ of Habeas Corpus filed by the Jaime Naranjo-Herrera (Hereinafter referred to as Petitioner) seeking release from his arbitrary, unlawful and unconstitutional detainment which is in violation of international instruments binding in the United States. The respondents have detained the Petitioner since May 4, 2021.

The Petitioner was taking in custody from Fremont Correctional Facility in Colorado. The Petitioner has been held in custody at the Aurora Ice processing center 63 days. This Habeas Corpus arises out of the need to remove the Petitioner out of the Custody of the persons who tortured him at the acquiescence of U.S. Immigration, Control and Enforcement.

Article 13 of the CAT protects both the complainant and the witness from ill consequences and punishment arising from the complaint of torture. The Petitioner is both a complainant and a witness to torture and the court is obligated under United States and international law to protect the Petitioner from the accused. (Article 13 of CAT and 18 USC 3771)

The Petitioner was imprisoned for his first offence and has lived in the United States for 57 years with a legal permanent resident card status, and has paid taxes and was a successful businessman. The Petitioner is desperate to be free from the torture he has endured and continues to suffer resulting from severe psychological trauma and irreparable harm being held in custody by the people who tortured and degraded him.  The Petitioner wishes to rejoin his family and make a smooth transition back into the community he so diligently engaged in prior to his crime.  Holding him in custody would only serve to torture him

1

further and obstruct justice. Having strong ties to the community and having a family make him easy to locate and low risk to the community.

The Petitioner needs to access mental health resources and better health care medical attention as well as to better address his trauma from the torture and other forms of cruel, inhuman, degrading treatment and/or punishments inflicted upon him by the persons holding him in custody for ICE.  Petitioner also continues to suffer from chronic Hypertension and Diabetes.  It is unreasonable to expect him to access mental health resources from the entity that tortured him and forcing him to stay in their care would be a blatant violation of the Convention against Torture and would place him at extreme risk of further torture and other forms of cruel, inhuman, degrading treatment and/or punishments

## CUSTODY

1. The Petitioner is in the physical custody of the Attorney General of the United States, US department of Homeland Security, U.S. Citizenship and Immigration services, U.S immigration and customs enforcement, officer Fabre, the Aurora ICE Processing Center and warden Choate in Aurora, Colorado. At the time of the filing of this petition the Petitioner is detained at the Aurora ICE Processing Center in Aurora, Colorado owned and operated by The GEO Group Inc. the Aurora ICE Processing Center contract with the U.S Department of Homeland Security to detain aliens such as the Petitioner. The Petitioner is under the direct control of the respondents and their agents.

2

# JURISDICTION

2. This action arises under the U.S Constitution, the U.N. torture convention, the Immigration and Nationality Act. This court jurisdiction under 18 U.S.C 3771, 28 U.S.C 2241, article 1 section 9 clause 2 of the U.S. Constitution, Amendment VIII of the same, 28 U.S.C § 1331 and article 1, 2, 13 and 16 of the CAT as the Petitioner is presently in custody under color of authority of the united states and such custody is in violation of the constitution, laws, or treatise of the united states. This court may grant relief to 28 U.S.C § 2241, the all writs act, 28 U.S.C. § 1651, 18 U.S.C §3771 and the Convention against Torture; however, this petition shall not be construed as a means to acquire monetary relief, and the petitioner reserves the right to seek relief for his arbitrary, unlawful and unconstitutional detainment and intimidation from bringing a complaint of torture any ill treatment or consequence from being a witness to torture.

# VENUE

3. Venue lies in United States District Court for the district court of Colorado, the judicial district in which  the respondents Aurora ICE Processing Center and warden Choate reside and where the Petitioner is detained pursuant to 28 U.S.C § 1391 (e)

## PARTIES

4.  The Petitioner Jaime Herrera-Naranjo is a resident of the United States who was taken into custody after serving his sentence in the Department of Corrections (DOC) of Colorado. He was detained by the respondents pursuant to sections 236 and 287 of the Immigration and Nationality ACT and part 287 of title 8, code of federal regulations. The petitioner was improperly served with a notice to appear from the department of Homeland Security pursuant to section 240 of the Immigration and Nationality ACT.  The Petitioner did not have a Notice to Appear when appearing for the first time in court, where upon he requested that a copy be given to him to see the charges being made by ICE.  The record of department of Homeland Security has listed Michoacán, Mexico, as the country of his birth.

5.  The respondent warden Choate is the warden of the Aurora ICE Processing Center in Aurora, Colorado, he is the Petitioner's immediate custodian and resides in the judicial district of the United States court for the district of Colorado.


## EXHAUSTION OF THE ADMINISTRATIVE REMEDIES

6.  Because of the blatant violation of the Convention against Torture, there are no administrative remedies that can be used to remedy the situation without placing the Petitioner at grave risk of further torture, therefore all administrative remedies have been exhausted.

7.  The Petitioner has fully cooperated with the respondents during his detention and administrative proceedings.

8.  The Petitioner's only remedy is by way of this judicial action as he is subject to torture and other forms of cruel, inhuman, degrading treatment and/or

4

punishments, and any delay places him at substantial risk for punishment especially since he has made a complaint.  Magistrate Judge Gordon P. Gallagher obstructed justice by directing the Petitioner to cure his motion for relief under 18 USC §3771 as a civil action under 28 USC §1915.  The court must not permit further obstructions.  Magistrate Gordon P. Gallagher used the rules of the court improperly applied to prevent the enforcement of 18 USC §3771.  Of vital importance, the Petitioner had previously requested that Magistrate Judge Gordon P. Gallagher, who is handling the motion for relief, not be assigned the case as  he had been observed to have demonstrated a pattern of obstructing justice, and it is probable that the Petitioner would experience an unlawful delay based on observed evidence.

## STATEMENT OF FACTS

9.  The Petitioner is a habitual resident of the United States who was taken into custody after being incarcerated for four and a half  (4 ½) years in Colorado, and has lived in the USA for over 57 years.

10. On Wednesday. June 15, 2021, on or about 7:30 a.m. the Petitioner was informed to get ready for clinical services appointment at 8:00 a.m. by the unit Correctional Officer (CO) on duty.

11. At around 8:00 a.m. the Clinical Services Agent (CSA) arrived and escorted other men on her list and said the Petitioner was not on the list and to wait for her return.

5

12. The same CSA returned on or about 8:30 a.m. and again said the Petitioner was not on the list but that she would check with Clinical Services and would inform him.

13. The Petitioner waited until about 11:00 a.m. but the CSA did not return nor was there any message passed on to the Petitioner about going to medical. The Clinical Services Nurse who dispenses the morning medicine to unit detainees stopped by and asked to check the Petitioner's blood pressure. The Petitioner refused the blood pressure check and proceeded to inform her of what had happened that morning i.e. waiting four (4) hours for medical services to bring him to medical but they never came back to get him. The Petitioner used this opportunity to express other items of concern to the nurse. The Petitioner brought up the fact that his third request asking for his medical records had just been responded to saying that he could not have his records in his possession and that they would be left in his property. The Petitioner gave the nurse the copy of the notice for her to look at. In the context of the Petitioner's repeated complaints and overall frustration with Medical Services, the Petitioner then made a comment that was meant to highlight the lack of response and follow-through of the Medical Services Department. The comment went something like this: 'If I said I was going on a hunger strike, you (meaning Medical Services), would respond differently than my usual responses, correct?" The nurse immediately asked the Petitioner, "are you going to kill yourself?" The Petitioner replied, "NO! I was only using this figure of speech to make a point". The nurse purported to not understand what the Petitioner was saying so she reported it as him saying that he was going to kill himself. Shortly after the nurse left the same morning CSA came back asking for him to go with her to medical services, which the Petitioner refused, thinking that it was about the

early morning's original appointment and not about the comment he made to the nurse. The Petitioner refused to go with her as the level of frustration had mounted.

14. A short while passed when a GEO Group Inc. L.T. came up to the Petitioner's room and asked to go with her to Medical Services. The Petitioner asked the L.T. why he was being asked to go with her and she proceeded to inform him that it was because of what he had said to the nurse concerning what the nurse purported. The Petitioner told the L.T. that it was an error on the part of the nurse and that he didn't want to hurt himself nor even thought about doing so. The Petitioner told her that there was no need to go to Clinical Services. The L.T. determined to escort the Petitioner to Medical Services then proceeded to give the Petitioner a direct order to come with her. The Petitioner promptly complied and followed her to Medical Services.

15. Once in Medical Services, the Petitioner met with the on-duty Medical Doctor and once again reiterated what he had told the nurse. The Petitioner was asked several routine questions about his intentions to hurt himself and once again the Petitioner expressly stated that at no time he said he wanted to kill himself. The Petitioner explained to the Medical Doctor what he had said and made it clear that the nurse purported to misunderstand the use of his language. The Petitioner reiterated this to him several times and to another nurse (or NP) talking with him. The Petitioner was made to wait for some time before the medical doctor finally came back and informed him that he (Petitioner) would be spending the night there in Medical Services until the Petitioner had an opportunity to talk with the psychologist, Dr. Wilson, who would be in early next morning. He did not inform the Petitioner of what was to follow.

7

16. It was late afternoon or early evening when the Petitioner was led to a small, what appeared to be a sterile cell, and four men and a women arrived asking him to undress and put on a soft-cloth smock. A short white man wearing a white GEO Group Inc. uniform, perhaps an L.T., instructed the Petitioner to take his clothing off while a woman behind him was holding a camcorder to her eyes, which looked like she was filming the incident. The other three men were husky GEO Group Inc. COs backing up the L.T. As the Petitioner began to undress without any fight the Petitioner asked why a woman was filming him undress. It must be noted that nobody announced her arrival in the room and proceeded as if it was normal operating procedure. Once the Petitioner expressed his concern the L.T. and CO's paused and immediately realized the Petitioner's unsettled composure to having a woman film him while taking his clothing off. The Petitioner does not recall whether the woman kept filming or handed the camcorder to another male CO. By this time the Petitioner was extremely unsettled emotionally.

17. Once the Petitioner settled in the room with only a smock, stark naked, the same doctor that had talked with him earlier stopped by and asked the Petitioner how he was doing. The Petitioner's response to him was that he was emotionally upset, and proceeded to express his total discontent. The Petitioner then asked the doctor how he would feel if he was detained on a false accusation, put in a sterile room stark naked, intimidated by four large men, and purportedly being filmed by a woman. The Petitioner proceeded to ask the medical doctor if that was protocol of detainees in these circumstances and the medical doctor said he didn't know and couldn't provide me an answer. He saw how visibly upset the Petitioner was and left the cell. The doctor showed no compassion with the Petitioner's condition and seemed to be making the visit more out of obligation than genuine concern.

8

18. As the Petitioner canvassed the room he noticed it had no towel for a shower, no soap, no toothbrush, no toothpaste, and only one blanket to keep him warm. The mattress had no sheets to cover the cold vinyl mattress. Two large windows faced towards the outside of the room, clearly making it easy for everyone outside to see inside. It must be noted that the main hub of the nurses work area could be seen from the inside, and vice versa from without towards inside the cell. A guard was placed to watch the Petitioner immediately outside his cell too keep a watch 24/7. They were asked to keep a log of every activity that they observed the Petitioner doing. At times they would simply stare at the Petitioner as if to find something unusual to report. The sink in the cell operated in a very low pressure whereby the Petitioner would have had to place his mouth next to the metal nipple to drink water. The metal nipple contained oxidized material that the Petitioner perceived as presenting health concerns to him. It wasn't until the next day that the Petitioner was provided a cup for him to capture water dripping from the faucet for him to drink. The lights in the room were bright and left on all night long. The Petitioner was asked not to cover his head during the night and to make his face visible at all times. With the Petitioner's medical condition, onset of glaucoma, the Petitioner's eyes require drops to relieve the pressure that builds up and the light makes his condition worse. The guards were notified of this and they didn't seem to care and insisted the Petitioner not cover his face.

19. Also, the Petitioner was made to walk barefoot throughout the bare, cold, concrete floor. The Petitioner informed the doctor when he spoke with him the day of his admission that he could not walk barefoot as he'd been known to have a tendency to get sick as a result, starting with a sore throat and leading to possible fever. The medical doctor didn't respond to the Petitioner's concern, and didn't seem to

9

care. Socks were never provided the Petitioner to wear to prevent him from illness that may have resulted from walking on a bare, cold, floor.  A soft material smock was provided the Petitioner to put on without so much as underclothes underneath.  The smock's Velcro would not stick and the Petitioner was constantly fixing it to stay on his naked body.  With the visible access to all the woman nurses outside the cell, the Petitioner was very concerned and asked for a different smock. The guard recognized the problem, informed his immediate supervisor, but neither one of them provided the Petitioner a replacement.  Once again, neglect to provide the Petitioner a smock that stayed on without continually adjusting it demonstrated a total disregard for the privacy and decent treatment of the Petitioner.

20. The first full day of solitary confinement, Thursday June 16, 2021, the Petitioner spent all day in the cell, electing not to eat anything as a way to protest his unusual and cruel punishment.  The Petitioner claims to have been treated with disrespect and an undignified manner.  Dr. Wilson, staff psychologist, asked that the Petitioner come into his office to talk with him but the Petitioner refused.  The Petitioner didn't want to walk naked with a smock that was falling off him across the nurses' work area and jeopardize the smock falling off.  Upon the Petitioner's refusal to walk over to see Dr. Wilson, Dr. Wilson decided to come into the Petitioner's cell to talk with him.  Dr. Wilson's first words are purported to be, "let's see about working something out."  The Petitioner refused to talk to him as he was still very upset of how he was being treated.  Dr. Wilson then left the room commenting he'd be back the next day.

21. Next day, Friday June 17, 2021, the Petitioner once again didn't eat all day, again protesting the inhumane manner of treatment again.  Sometime during mid-morning the Petitioner once again was asked to walk in his smock to Dr. Wilson's office.  The Petitioner refused, fearing the defective smock would fall off and expose his nakedness to the nurses that were in the area immediately outside Dr. Wilson's office.  Dr. Wilson proceeded to come to the Petitioner's cell to talk things over.  The Petitioner expressed to Mr. Wilson that he (the Petitioner) was being treated with disrespect and an undignified manner, and that once he (the Petitioner) was treated with respect and dignity, he would talk with him.  Dr. Wilson then left the Petitioner's cell and said he'd stop by next day.

22. Late Friday afternoon, the Petitioner asked the CO on duty to approach the door because he was making a statement that the Petitioner wanted him to pass on to his immediate supervisor, a GEO Group Inc. L.T.  The Petitioner expressed to the CO that he (the Petitioner) was there on a false accusation, that he was being humiliated and treated with cruel and unusual punishment, bordering on torture, by subjecting him to undress in front of 4 men and purportedly filmed by a woman. The Petitioner also told him that he had not eaten for two days because he was protesting their treatment of him. The CO said he'd pass it on to his supervisor.

23. A while passed and The GEO Group L.T. did not stop by so the Petitioner once again asked a different CO to ask the L.T. to stop by because he wanted to talk with him.  The CO called the L.T., a tall white male individual, and the L.T. listened to the Petitioner's statement, the very same the Petitioner had communicated to the CO earlier.  Since this GEO Group Inc. L.T. listened compassionately the Petitioner proceeded to convey to him that he would resume eating in the morning (Saturday) and asked him to look into the protocol of asking

11

someone to undress and to see if having a woman filming the process was company protocol. The L.T. said he didn't know if having a women filming the incident was protocol and would get back to him. The GEO Group Inc. L.T. never got back to the Petitioner as promised.

24. The next day, Saturday June 18, 2021, Dr. Wilson once again asked the on duty CO to ask the Petitioner to come into his office. By this time, and although the Petitioner was wearing the same smock that barely held itself in place, he humbled himself and walked over to his office, all the while cognizant of the potentiality of the smocks ineffectiveness. The Petitioner sat in his office, and expressed his frustration with a broken down medical system that had repeatedly denied his medication, lack of follow through on his requests, erroneous and misinformation, etc. Dr. Wilson explained to the Petitioner the massive changes that were undergoing in the facility due to the sudden increase number of detainees and the unusually high employee turnover.

25. The Petitioner explained that he had eaten that morning and that he had had a good conversation with the GEO Group Inc. L.T. the night before. The Petitioner asked Dr. Wilson if it was protocol to have an elderly man undress with four men present, and a women filming him while he undressed. Dr. Wilson could not tell the Petitioner if it was GEO Group Inc. company protocol. Once again, the answer to the Petitioner's inquiry about GEO Group Inc. protocol was evaded and not answered. At the conclusion of the conversation with Dr. Wilson, Dr. Wilson decided to sign off on the Petitioner's release from solitary confinement but that it would take place on Monday as his boss was not in on the weekend. After the meeting with Dr. Wilson, the Petitioner was provided his cloths, a radio, one book to read and a wash cloth to cover his eyes while sleeping.

26. The Petitioner ate normal again on the following day, Sunday June 19, 2021.

27. On Monday morning June 20, 2021, the Petitioner met once again with Dr. Wilson to check base before the Petitioner was allowed to return to the general population.

28. The entire incident has traumatized the Petitioner.  And although  the Petitioner mentioned to a video site psychologist the next morning that he felt fine, the Petitioner noticed within himself a deep seated unsettled feeling, bordering in anger and resentment, as he thinks of the humiliating, cruel and unusual punishment behavior on the part of The GEO Group Inc. employees.  The Petitioner is not sleeping through the night and is frequently waking up thinking of the whole incident.

## QUESTIONS

29. Is it constitutional to grieve cruel and unusual punishment to the agency that acquiesced to torture?  Does that violate the convention against torture?

30. Does a detainee in immigration proceedings have the right to be free from torture?

31. Is it constitutional to torture a person who has been convicted of a crime?

32.  Is it constitutional to have a person in the custody of parties who tortured them?

33. Is it constitutional to deprive a person of liberty without due process of law?

34.  Is it constitutional to violate the torture convention?

35. Does the institutional grievance policy circumvent the torture convention?

# CLAIMS FOR RELIEF

## COUNT ONE

36. The Petitioner alleges and incorporates paragraphs 1 through 35

37. The Petitioner's detainment violates his rights guaranteed under the U.S.

Constitution including without limitation:

Amendment IV: Security of person

Amendment V rights: Nor be deprived of life liberty or property without due process of law

Amendment VIII rights: No cruel and unusual punishments inflicted.

## COUNT TWO

## TREATY OF CLAIM

38. The Petitioner alleges and incorporates paragraphs 1 through 37.

39. The Petitioner continued detainment violates the U.S Constitution and following

United  Nations treaties:   Article 1, 3, 13, and 16 of the U.N. torture Convention

## COUNT THREE

## STATUTORY CLAIM

40. The Petitioner alleges and incorporates by reference paragraphs 1 through39.

41. The Petitioner's continued detainment violates the U.S. Constitution, the U.N torture convention title 28 U.S.C 3771, and the Immigration and Nationality ACT.

14

## PRAYER FOR RELIEF

Wherefore the Petitioner prays that the court grants the fallowing relief:

1. Assume jurisdiction over this matter ;
2. Issue a writ of Habeas Corpus ordering the respondents to release the Petitioner on his own recognizance with all his personal effects.
3. Grant any other relief which the court deems just and proper in accordance with Law for the Petitioner.

Respectfully submitted
Jaime Naranjo-Herrera
Aurora ICE Processing Center
3130 N. Oakland St.
Aurora, CO 80010

## VERIFICATION OF PETITIONER

I Jaime Naranjo-Herrera certify that I am the Petitioner and that the facts stated above are true and correct to the best of my knowledge and beliefs.

Jaime Naranjo-Herrera

Affirmed before me at Aurora, Colorado this 19th day of July, 2021.

Notary Public

**BRIDGET YOLANDA JACKSON**
**NOTARY PUBLIC**
**STATE OF COLORADO**
NOTARY ID 20144005872
My Commission Expires February 5, 2022

Naranjo
#A141219066
Aurora ICE Processing Center
3130 N. Oakland St.
Aurora, CO 80010

Hasler
07/26/2021
US POSTAGE $001.40⁰
ZIP 80010
011E10674572

$1.40

Office of the Clerk
United States District Court
Alfred A. Arraj Courthouse
901- 19ᵀʰ St. Room A105
Denver, CO 80294-3589

Case No. 1:21-cv-01794-LTB   Document 5   filed 07/29/21   USDC Colorado   pg 17 of 18